## MABEL DAY, ADM'X, v. R. Y. CROSS, ET AL.

SUPREME COURT, AUSTIN TERM, 1883.

*Contract—Construction of.*—When the contract is to furnish or sell certain goods identified by reference to independent circumstances, such as an entire lot deposited in a warehouse, &c., the naming of the quantity is regarded only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. So a contract for sale and delivery of cattle in which there is merely an estimate that the number in the marks and brands mentioned is about 10,000, the seller will not be liable if it is less, provided he has acted in good faith in making the estimate.

*Same—Diligence.*—See opinion for charge in diligence, held to be correct.

Appeal from Travis County.

*Sheeks & Sneed, John Hancock, Smith & Trigg* for appellant.

*Walton & Hill* for appellees.

Opinion by Willie, C. J.

The decision of this cause depends in a great measure upon the true construction of the contract on which the suit is brought as to the number of cattle the appellees were bound to deliver to Day, or his representatives. If by the terms of that contract they were absolutely bound to deliver by the first of August, 1881, ten thousand head, or reasonably near that quantity, then as they delivered and tendered but little over half that amount, their contract was violated, and they should not have recovered the verdict they did. If, on the other hand, the number to be delivered depended upon what they could, with the proper use of skill, care and diligence, collect and turn over to appellee at the place, and by the time appointed, then the turning point in the case is as to the amount and degree of such care, skill and diligence exercised by the appellees in making such delivery.

Contracts for the sale of goods in which the quantity to be delivered is qualified by the words *more or less*, and the purchase money is to be determined by the number of articles delivered, are thus classified by the Supreme Court of the United States in Brawley v. U. S., 6 Otto, 171.

1. When the contract is to furnish goods of a certain quality or character to a certain amount.

2. When the contract is to furnish or sell certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, &c.

3. When other qualifying words are added the more clearly to explain what the intention of the parties was in naming the quantity and allowing the contract to be performed by delivering more or less of it.

For instance when some future act on the part of the seller or purchaser is to fix the quantity of goods which is to be delivered, these qualifications may be added to either of the first two classes, and in that event will limit and explain the meaning of the quantity as restricted by the expression, more or less. In the first of these cases if the goods delivered vary materially in quantity from the amount bargained for, the contract will be violated. In the 2nd, the naming of the quantity is regarded only as an estimate of the probable amount in reference to which good faith is all that is required of the party making it." Brawley v. U. S., *supra*.

In the third case the seller is bound to deliver the quantity as determined by the future action on the part of the seller or buyer as the contract provides.

For instance in the case cited, the agreement was to deliver "880 cords of wood, more or less," as should be determined to be necessary by the post commander, &c., and it was held that the post commander having determined that only 40 cords were needed, it was held that the United States was not liable for any number of cords beyond the 40 cords delivered.

See also Grullim v. Daniel, 2 Cromb., M & R., 61.

Robinson v. Poole's Adm'r., 8 Pet., 181.

Pembroke Iron Co. v. Parsons, 5 Gray, 589.

Applying these principles to the present contract, we find that it does not in the least assimilate itself to the first class as before defined. Disregarding the provisions of the 3rd section of the agree-

ment, we have a contract of the second class in which there is merely an estimate that the number in the brands and marks mentioned is about 10,000, and the seller will not be liable if it is less, provided he has acted in good faith in making the estimate.

His contract is in effect to deliver all the cattle in the named brands, with certain exceptions, be the same 10,000, or more or less; and unless he has committed a fraud in making his estimate, his contract is fulfilled when he furnishes the entire stock in those brands, less the exceptions.

But the third section explains and qualifies the meaning of this stipulation of the parties and shows that the quantity sold was only so much as should be actually delivered by the first of August, 1881. This section adds, by way of giving greater strength and clearness to the meaning of the parties, that all the cattle in said brands, meaning the said supposed 10,000 head, left on the range after the first of August, 1881, are not embraced in the sale, but remain the property of the vendors. Words could not be plainer nor more explicit to guard the sellers against any conveyance of or obligation to convey 10,000 cattle or thereabouts, or all in the brands mentioned, but only such of them as they should deliver by a certain time. The only question left open was, as to what diligence the vendors were to use in gathering and delivering the cattle. This might have been the subject of a stipulation, and then the vendors would have been in default and liable to damages if the failure to deliver was in consequence of a neglect to comply with such stipulation. But there was no agreement on this subject, and in its absence the law says that the parties intended that reasonable care and skill, energy and diligence must be used by the person charged with that duty, in collecting the cattle, and placing at the proper place of delivery within the stipulated time; and this was a question for the jury under proper instructions from the court; there being no allegation in appellant's pleadings that the appellees had falsely or fraudulently represented that there were 10,000 cattle in the brands name at the date of the contract, but the amount being to the contrary, *i. e.* there were that many, but that were not all delivered.

Thus the question at issue between the parties was in effect narrowed down to this : Did the sellers deliver all the cattle subject to the contract, which by the use of proper diligence, they could

have delivered at the time and place at which they contracted to make the delivery ?

An examination of the charge of the court shows that it was entirely in accordance with the views of the law announced in this opinion, and submitted them to the jury in a clear, concise and able manner.

After briefly stating the pleadings, the court charged that the contract contained no guaranty as to the number of cattle in the marks and brands. That it was a mere contract of sale of said marks and brands and an undertaking by the sellers to deliver said stock by Aug. 1, 1881, and that such only as were actually delivered by that time passed to the vendee, the balance remaining unaffected by said contract.

He also charged that the vendors were obliged to use, to effect such delivery that care, skill and energy which a good business man engaged in the stock business would use to collect said stock of cattle and deliver them at the place where these vendors were bound to furnish them to the vendee, and at the time mentioned in the contract. If the vendors did this it amounted to reasonable diligence, and hence the charge fulfilled the requirements of the law in all these respects.

This left to the jury the power to determine as to the diligence used by appellees in collecting and delivering the cattle, and as the evidence on that subject was conflicting, and to say the least, not very unequally balanced, the finding of the jury cannot be disturbed on that account. Mullins proved the employment of sufficient hands for the purpose; their constant work at getting and delivering; the delays caused by the death of his father and of the purchase of the stock; the fact that the cattle were scattered over a country for hundreds of miles, and that they were faithfully searched for in every place where they ranged, and that there were not more than 6100 or 6200 all told, subject to the contract after deducting those excepted; of these he had actually delivered 5061 and tendered 500 more, leaving from 4 to 6 hundred undelivered. If this was the evidence credited by the jury, it was certainly sufficient to show reasonable diligence in collecting and delivering all but the 4 or 600 head, and as damages were allowed for failure to deliver to the extent of $1500, and there was no culpable failure in reference

to any other portion, we must conclude that the allowance was made in reference to them.

It is further said by appellant that the charge of the court as to the tender of the 500 head of cattle on 27th July, 1881, was erroneous. The court charged that all cattle tendered and refused were taken out of the contract—which was correct law unless the tender was attended with some circumstance that prevented it from being equivalent to a delivery. The only circumstances of this character which the evidence justified the court in submitting to the jury, were stated in the charge. The appellant claims that the tender was coupled with a condition that Driskill should receive this herd of 500 in full satisfaction of the balance due on the contract. This is the testimony of Driskill, but the evidence of Mullins shows that when he offered the cattle, he told Doc. Day on 27th July, 1881, that as far as delivering more cattle was concerned, he did not have time to deliver them before the contract would expire, and if he should deliver any more he would have to take Driskill's word for the pay. He offered to deliver the cattle that he had brought with him in accordance with the contract, and notified the men to deliver as they had done in Day's lifetime. Now it is evident that up to this time there was no condition asked in reference to the tender; and none was asked until Driskill refused to receive the drove, because they were of inferior quality—about which the contract did not provide—and unless he would for that reason deliver 1500 more. It was in reply to this demand that Mullins told Driskill that he did not have time to collect more before the expiration of the contract; and that if he took the cattle, he (Mullins) would consider the contract at an end whether Driskill did or not.

The jury evidently gave credit to this testimony; and if they did, they believed that Mullins originally annexed no conditions to his tender, and afterward, only refused to submit to an unreasonable demand on the part of .Driskill, viz: that he should do a thing which it was out of his power to do, and which his contract did not demand of him. It was Driskill that imposed unreasonable conditions as to the tender, and it was his refusal to receive the cattle unless these conditions were complied with that rendered the tender ineffectual. If the cattle offered had been received without anything passing upon the subject, it is clear that the contract would

have been complied with on the part of Mullins, except perhaps, as to the 400 or 600 head before mentioned.

The demand, therefore, for 1500 more, imposed new burdens and conditions on appellees, which they were not bound to submit to in order to secure an acceptance of the cattle tendered. The court did not err in refusing to give the instructions asked by defendant's counsel, because the correct law upon the subject of these charges had already been placed before the jury in the general instructions submitted to them.

The measure of damages asked by this charge is in effect what the court had already given.

It was not what is contended in the 12th assignment of error, the difference between the contract price and the highest market value between the date when to be delivered, and the time of trial—for the undelivered cattle had not been paid for.

Randon v. Barton, 4 Texas, 289.

It is complained that the court should not have rendered a judgment foreclosing the lien provided for in the contract upon a verdict which does not find that such lien existed. The contract was pleaded by both parties and put in evidence without objection, and this showed that if the plaintiffs were entitled to recover, they were entitled to have the lien enforced. By failing to deny this in their pleadings, the defendants admitted the lien, and there was no proof about it necessary, and nothing in reference to it for the jury to determine. Hence the lien was properly foreclosed without a verdict establishing it. Pearce v. Bell, 21 Texas, 691.

As to the numerous objections taken to the ruling of the court excluding appellees evidence, it will be found upon an examination of it in connection with the principles upon which this opinion is based, that all of this testimony was irrelevant, and unimportant, and tended to raise issues foreign to the cause. The evidence of Mrs. Day mentioned in 2nd assignment was offered, it is said, because it proved an implied admission of Mullins that there were other cattle undelivered, and which could have been delivered under the contract; and that it would have shown a purpose not to deliver more cattle unless for a better price. It might have shown that he expected that some cattle would be undelivered at the expiration of the contract. This was a contingency contemplated by the parties as likely to happen without fault on the part of the seller, and hence

they made provision for it. For fear that the jury might put the very construction upon it which appellant thinks they would have done, the evidence should not have gone to them.

The facts proposed to be proved by Driskill in his answer to 20th interrogatory and excluded by the court was irrelevant and unimportant. The utmost that it would have proven was that Mullins supposed or knew that there were cattle subject to the contract in his possession after its expiration. This was admitted, and moreover it did not tend to prove the only issue on that subject, viz: that they were there because he had not used due diligence to collect and deliver them in time.

The other evidence ruled out tended to show what was Chas. Mullins' estimation of the number of cattle in the brands conveyed before and subsequent to the date of the contracts. What they were before was not important because they might have been increased or diminished by purchase or sale between that time and the date of the contract. Besides, the contract estimated them at 10,000; and whether this estimate was right or wrong could make no difference. The point was: Did the sellers use diligence to deliver the cattle in time? And this testimony would have thrown no light upon that subject. Upon the whole we see no error in the judgment, and it is affirmed.